UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BRIAN D. CLARK,
                    Plaintiff,

v.                                                      C.A. No.: 4:09-CV-10328

PROVIDENCE AND WORCESTER
RAILROAD COMPANY,
                    Defendant.

## BRIEF OF DEFENDANT PROVIDENCE AND WORCESTER RAILROAD COMPANY REGARDING PREEMPTION AND FELA NEGLIGENCE PER SE

Defendant Providence and Worcester Railroad Company ("P&W") submits this brief in support of its Motion Regarding Preemption and FELA Negligence Per Se.  P&W asserts a number of legal issues that may be dispositive in this case and believes that decisions on these issues will narrow the evidence and issues to be tried.  Specifically, P&W argues:

1.  The application of M.G.L. ch. 160, § 134A, Massachusetts' track clearance statute, to P&W's construction project is preempted by the Interstate Commerce Commission Termination Act.

2.  M.G.L. ch. 160, § 134A is not a federal railroad safety statute and may not serve as the basis for negligence per se or bar P&W's contributory negligence defense under the FELA.

3.  Occupational Safety and Health Act Regulations implicated by this case are preempted by the Federal Railroad Administration's exclusive jurisdiction over "railroad operations."

4.  OSHA regulations implicated by this case may not serve as the basis for negligence per se or bar P&W's contributory negligence defense under the FELA.

Congressional statutes and applicable case law support P&W's arguments and P&W moves this Court to find that M.G.L. ch. 160, § 134A and OSHA regulations are preempted by the Interstate Commerce Commission Act and the Federal Railroad Administration's exclusive jurisdiction over railroad operations, respectively.  In the alternative, P&W moves this Court to find that a violation of M.G.L. ch. 160, § 134A and/or OSHA regulations may not serve as a basis for negligence per se under the FELA or bar P&W's contributory negligence defense.

## I.    FACTUAL BACKGROUND

This is a Federal Employer's Liability Act ("FELA") action filed against Defendant Providence & Worcester Railroad Company ("P&W").  Plaintiff Brian D. Clark was employed by P&W as both a conductor and an engineer.[1]  On January 26, 2009, Plaintiff was working a yard conductor job in P&W's Worcester, MA, rail yard.  As part of his responsibilities that evening, Plaintiff was responsible for train access and train movement in the yard, and, with his engineer, Steve McGill, was conducting various yard switching operations.  (Pl.'s Dep. at 49, 113, 117-18, 157-61, relevant excerpts attached as Exhibit A.)  Plaintiff had control of all train movements in and out of the Worcester yard, was the only conductor working in the yard, and had authority to direct all train movement performed by Engineer McGill.  (Ex. A at 113, 124-26, 150.)  In addition, Plaintiff was required to comply with a number of safety rules and regulations, including P&W's company safety rules.  (Id. at 29-33.)  These rules required Plaintiff to keep a lookout for close clearance conditions and included a prohibition against mounting and dismounting moving equipment.  (Id. at 338-40; 363-65.)

That evening, Plaintiff sustained an injury to his rectum and colon when he was impaled on a piece of metal rebar when he stepped off a tank car.  The rebar was actually part of a larger

---

[1] Plaintiff had a previous work related injury wherein he brought suit against P&W.  That claim is resolved.  As a result of the injuries sustained in the previous incident, Plaintiff had returned to work in August of 2008.

safety warning apparatus erected by P&W to warn its employees of a potential tripping/falling hazard near the tracks in the Worcester yard. (See Photograph of barricade, attached as Exhibit B.) In October 2008, a construction project to eliminate an electrical pole line (the "Project") in the yard was halted due to oncoming winter weather. (See B. Cartier Aff., attached as Exhibit C.) The project involved removing pole-suspended electrical lines supplying power to various pieces of track-side equipment in the yard and burying those lines underground. One location where this project was being conducted was at a switch heater relay case adjacent to one of P&W's rip (repair) tracks (the same track over which Plaintiff was operating just before his incident). (Id.) Because of the difficult digging conditions that accompany a New England winter, an excavation pit created for conduit installation was left open in October 2008 and demarcated by four stakes and yellow caution tape. (Id.) Three surveying stakes and a piece of rebar were used as a temporary barricade to secure the caution tape around the excavation site and to serve as a visual safety warning and advisory to employees of a potential trip or fall hazard. (Id.) The piece of rebar on which Plaintiff was impaled was one of the four stakes securing the caution tape and had been in place since October 2008, three months before Plaintiff's incident.

As a result of his injury, Plaintiff was taken by ambulance to UMASS Memorial Hospital in Worcester where he was diagnosed with a perforated rectum which required a colostomy. The colostomy was reversed in June of 2009. In November of 2009, Plaintiff was released to return to work without restriction by his treating gastric surgeon, Dr. Ulises Torres.

By letter dated December 1, 2009, Plaintiff was terminated from his position due to violation of the P&W Company Safety Rules, specifically Rule T1110, which bars the mounting or dismounting of moving equipment except in emergency situations.

On March 5, 2009, Plaintiff filed his Complaint alleging P&W failed to provide him with a reasonably safe place to work pursuant to the FELA, 45 U.S.C. § 51, et seq., and alleging P&W violated certain OSHA regulations, the violation of which caused Plaintiff's injury.   In its Answer to Plaintiff's Complaint, P&W, asserted, inter alia, the defense of Plaintiff's contributory/comparative negligence.

## II.   DISCUSSION OF LAW

### A.   Preemption and the Interstate Commerce Commission Termination Act.

#### 1.   The Surface Transportation Board has exclusive jurisdiction over railroad construction.

The *Supremacy Clause of the United States Constitution* provides that "the Laws of the United States . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. CONST., Art. VI, cl. 2.  Thus where a state law conflicts with or frustrates a federal law, the former must yield. CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 663, 123 L. Ed. 2d 387, 113 S. Ct. 1732 (1993); Maryland v. Louisiana, 451 U.S. 725, 746, 68 L. Ed. 2d 576, 101 S. Ct. 2114 (1981).  The *Supremacy Clause* preempts State law in three circumstances: (1) express preemption, where Congress explicitly defines the extent to which its pronouncements preempt state law; (2) preemption where Congress regulates conduct in a field and intended the Federal Government to occupy the field exclusively; and (3) conflict preemption, where state law is preempted to the extent it actually conflicts with federal law.  English v. General Elec. Co., 496 U.S. 72 (1990).

In 1995, Congress enacted the Interstate Commerce Commission Termination Act ("ICCTA"), 49 U.S.C. §10101, et. seq. Congress passed the ICCTA in 1995 in an effort to decrease regulatory controls over the railroad industry. The ICCTA amended certain sections of Title 49 governing the economic regulation of railroads. The ICCTA, which became effective on

January 1, 1996, abolished the Interstate Commerce Commission ("ICC") and created the

Surface Transportation Board ("STB") which it vested with exclusive jurisdiction over—

> (1)    transportation by rail carriers, and the remedies provided in this part with respect to rates, classification, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
>
> (2)    **the construction**, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or **facilities**, even if the tracks are located, or intended to be located, entirely in one State.

49 U.S.C. § 10501(b) (emphasis added). "Rail transportation" is broadly defined to encompass

any property, facility, or equipment related to the movement of freight by rail. The broad nature

of Congress' preemption under the ICCTA is further evidenced by the expansive definitions for

the terms "railroad" and "transportation." The ICCTA defines "railroad" as including:

> (B)    the road used by a rail carrier and owned by it or operated under an agreement; and
>
> (C)    a switch, spur, track, terminal, terminal facility, and a freight depot, yard and ground, used or necessary for transportation.

49 U.S.C. § 10102(6). The definition of "transportation" includes:

> (A)    a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use; and
>
> (B)    services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation,     storage, handling and interchange of passengers and property.

49 U.S.C. §10102(9). "It is clear . . . that Congress intended the preemptive net of the (ICCTA)

to be broad by extending exclusive jurisdiction to the STB over anything included within the

general and all inclusive term 'transportation by rail carriers.'" Georgia Pub. Serv. Comm'n, 944

F. Supp. at 1582. "By preempting state regulation of railroad operations, and granting exclusive

jurisdiction over almost all aspects of railroad operations to the STB, Congress removes the ability of states to frustrate its policy of deregulating and reviving the railroad industry."  Id. at 1583.

The STB has primary jurisdiction over all aspects of railway operations and facilities, Boston & Maine Corp. v. Town of Ayer, 330 F.3d 12, 15-16 (1st Cir. 2003), and has exclusive jurisdiction to regulate rail carriers' construction and operation of rail switches, side tracks, and facilities.  49 U.S.C. § 10501(b); see CSX Transp., Inc. v. Plymouth, 92 F. Supp. 2d 643 (E.D. Mich. 2000).   "[W]hen section 10501(b) grants the STB exclusive jurisdiction over 'transportation by rail carriers,' it logically includes the yard, property, facilities and any intermodal equipment used in connection with a railroad, or related to the movement of passengers or property."  Soo Line R.R. v. Minneapolis, 38 F. Supp. 2d 1096, 1099 (D. Minn. 1998).

Congress' power to regulate the railroad industry has been well-recognized and the preclusive effect of federal regulation has been repeatedly acknowledged.  See, e.g., Plymouth, 92 F. Supp. 2d 643; Fayard v. N.E. Vehicle Servs., 533 F.3d 42 (D. Mass. 2008).  Under some circumstances, courts making determinations regarding federal preemption must begin with a presumption of nonpreemption.  See, e.g., Jones v. Rath Packing Co., 430 U.S. 519 (1977).  However, when a State regulates an area where there has been a significant history of federal presence, there is no presumption of nonpreemption.  U.S. v. Locke, 529 U.S. 89 (2000).  The extensive federal statutory and regulatory scheme in place regarding the railroad industry clearly indicates that "there is no beginning assumption that concurrent [railroad] regulation by the State is a valid exercise of its police powers."  Plymouth at 649, citing Locke, 529 U.S. 89 (2000).  As one court has observed about the ICCTA, "it is difficult to imagine a broader statement of

Congress' intent to preempt state regulatory authority over railroad operations." <u>CSX Transportation, Inc. v. Georgia Pub. Serve. Comm'n.</u>, 944 F. Supp. 1573, 1581 (N.D. Ga. 1996).

A trial judge in the United States District Court for the District of Minnesota, in the case of <u>Soo Line Railroad Co. v. City of Minneapolis</u>, 38 F. Supp. 1096 (D. Minn. 1998), granted summary judgment in favor of the railroad, where it had sued the City for declaratory judgment and injunctive relief arising from the City's refusal to grant it demolition permits. The railroad had, pursuant to the City's "Code of Ordinances," applied for (and was denied) permits to demolish several buildings in a rail yard. The demolition was a necessary part of the railroad's redevelopment of the yard. One of the City's departments had denied the permit application on the grounds that the buildings which had been scheduled for demolition may have had historic value. <u>Id.</u> at 1097-1098. In granting the railroad's motion, the court determined that the ICCTA preempted the City's authority to regulate the railroad's proposed activities, finding that:

> [t]he language of the Act expresses Congress' clear intent to preempt state and local regulatory authority over the **construction, development, and operation of railroad facilities** . . . . [The] demolition of the five buildings and **subsequent construction, development, and operation** of the proposed bulk transfer facility is subject only to such regulations and requirements as may be imposed by the STB pursuant to the ICCTA.

<u>Id.</u> at 1101 (emphasis added). The court recognized that construction work in a railroad facility was within the sole jurisdiction of the STB.

### 2.    M.G.L. ch. 160, § 134A: Proper Clearance of Tracks in Railroad Yards

Throughout the course of discovery, Plaintiff has alleged P&W violated M.G.L. ch. 160, § 134 ("Track Statute"), a Massachusetts state statute regarding track clearances in rail yards. The Track Statute states in pertinent part:

> Platforms or buildings may be constructed or maintained at a minimum distance of five feet nine inches from the center line of the track adjacent to any such

platforms or buildings, providing a clearance of not less than eight feet six inches, plus one inch per degree of track curvature, is maintained on the opposite side of such track to any fixed structure . . . .

**No other structures or obstructions shall be maintained in such yard nearer than eight feet and six inches . . . from the center line of any track** . . . .

Mass. Gen. Laws ch. 160, § 134A (emphasis added). There is no Massachusetts or First Circuit Case law interpreting the scope or application of the Track Statute. Plaintiff argues that a violation of the Track Statute is a violation of a safety statute and gives rise to negligence per se under the FELA and removes Plaintiff's contributory negligence from consideration by the jury.

       **3.     The Track Statute is a construction statute preempted by the ICCTA.**

In the instant case, Plaintiff alleges the Track Statute was violated by P&W and serves as a foundation for negligence per se liability under the FELA. The Track Statute as applied to the temporary barricade erected by P&W is preempted by the ICCTA. The Track Statute, on its face, is a construction statute that dictates where a railroad may maintain structures adjacent to tracks in rail yards. The plain language of the ICCTA vests the STB with exclusive jurisdiction over the construction of railroad tracks and facilities. Congress, through the language of the ICCTA, has made clear its intent to vest the STB with sole jurisdiction of the construction of railroad tracks and facilities. The Commonwealth of Massachusetts cannot step into an area wholly and exclusively regulated by the Federal Government; the *Supremacy Clause* prohibits it. The Track Statute directly interferes with construction operations in railroad facilities and is exactly the type of interference the ICCTA prohibits by vesting the STB with sole jurisdiction over such matters.

       **4.     <u>Tyrrell v. Norfolk Southern Ry. Co.</u> is distinguishable and the application of the Track Statute to the facts of this case is preempted by the ICCTA.**

P&W anticipates Plaintiff may rely on Tyrrell v. Norfolk Southern Ry. Co., 248 F.3d 517 (6th Cir. 2001), a Sixth Circuit Court of Appeals case holding that an Ohio track clearance regulation was not preempted by the ICCTA. The plaintiff in Tyrrell brought an FELA action alleging the defendant railroad violated an Ohio regulation prohibiting railroad tracks from being placed too close together. The Sixth Circuit Court of Appeals determined the ICCTA should be read in connection with the Federal Rail Safety Act ("FRSA") and concluded that the Ohio regulation was a standard related to rail safety that required analysis under the FRSA.[2] The court concluded that, since there was no FRA regulation covering the subject matter of minimal track clearance, the Ohio regulation was an appropriate gap filler in the federal rail safety scheme and was not preempted by the FRSA. Tyrrell, 248 F.3d at 525.

To the extent that the Track Statute governs where a permanent structure must be located in relation to P&W's tracks in its Worcester rail yard, Tyrrell may support the conclusion that the Track Statute is not preempted by the ICCTA. However, the existence of a permanent structure is not at issue in this case. Plaintiff was injured on a temporary barricade, not a permanent non-compliant structure. Importantly, the barricade here was related to a construction project,

---

[2] In 1970, Congress enacted the Federal Railroad Safety Act ("FRSA") with the goal of "promot[ing] safety in every area of railroad operations and reduc[ing] railroad-related accidents and incidents." See 49 U.S.C. §§ 20101 et seq. Under its preemption provision, the FRSA states: "Laws, regulations, and orders related to railroad security shall be nationally uniform to the extent practicable." See 49 U.S.C. § 20106(a)(1). To assure this uniformity, the FRSA authorizes the Department of Transportation ("DOT") to exercise broad and general regulatory powers in all areas of railroad safety. The DOT promulgates its FRSA-authorized railroad regulations through the Federal Railroad Administration ("FRA"); those regulations are codified at 49 Code Fed. Regs. §§ 200 et seq.. See Department of Transportation Act of 1963, Pub. L. No. 89-670, codified 49 U.S.C. § 103(3)(e)(1) (creating FRA).

The FRSA also includes an express preemption provision, which provides in pertinent part that a state retains authority to regulate railroad safety, but only "until the Secretary of Transportation . . . prescribes a regulation or issues an order covering the subject matter of the State requirement." 49 U.S.C. § 20106(a)(1)-(2). A state may adopt a more stringent requirement as long as it: "(A) is necessary to eliminate or reduce an essentially local safety or security hazard; (B) is not incompatible with a law, regulation, or order of the United States Government; and (C) does not unreasonably burden interstate commerce." 49 U.S.C. § 20106(a)(2). Thus, "[a]t the present time where the Federal Government has authority, with respect to rail safety, it preempts the field." See H.R. Rep. 1194, 91st Congress., 2d Sess., 11, reprinted in 1970 U.S.C.C.A.N. 4108-4109; see also CSX Transp., Inc., v. Easterwood, 507 U.S. 658 (1993).

P&W's pole-line elimination project, which was in compliance with the Track Statute.  P&W erected the temporary barricade to warn employees of a temporary hole adjacent to the tracks, a hole that was located outside the clearance distance proscribed by the Track Statute.  (See Ex. C.)  Applying the Track Statute to an ongoing construction project and all incidents and objects associated with that project would result in State interference with every aspect of construction in P&W's rail yard.

For example, had P&W's completed pole-line project resulted in the erection and maintenance of a permanent electrical cabinet adjacent to its tracks, under the reasoning in Tyrrell, the Massachusetts legislature may have been able to dictate the placement of that electrical cabinet through the application of the Track Statute.  On the other hand, suppose P&W's pole-line project required the construction of an electrical cabinet outside the clearance zone, that P&W needed to erect temporary scaffolding or supports around the partially completed cabinet, and that temporary scaffolding or support mechanism was within the Track Statute clearance zone.  In that case, the Track Statute could be used to regulate the actual methods of construction, not solely the placement of permanent structures.  Such an application would allow the Massachusetts legislature to circumvent the exclusive jurisdiction of the STB under the ICCTA and dictate to P&W specific construction methods and materials, essentially allowing the legislature to control "how" P&W performs and completes any construction and erects any structures in its rail yard.  This is clearly impermissible under the express language of the ICCTA.

The latter example is analogous to what Plaintiff hopes to do in this case.  P&W did not erect a permanent, non-conforming structure.  Instead, it was in the process of completing a construction project that did not involve the maintenance of any permanent structure near the

tracks.  Plaintiff's requested application of the Track Statute would dictate the "process" and "methods" of construction, not simply track clearances and the placement of structures.  The application of the Track Statute to the process and methods of construction would impermissibly grant the Massachusetts Legislature control over the construction of railroad tracks and facilities, an area that is within the exclusive jurisdiction of the STB.  There is no support in the ICCTA statute or case law for Plaintiff's expansive application of the Track Statute.  Such an application is excessive and the plain language of the ICCTA preempts application of the Track Statute to the temporary barricade erected by P&W.

     **B.**     **A violation of the Track Statute does not constitute negligence per se under the FELA.**

     **1.**     **FELA Negligence Per Se and Contributory Negligence**

Under the FELA, Plaintiff must show that P&W negligently failed to provide him with a reasonably safe workplace resulting from a defect or insufficiency in the railroad's equipment or property 45 U.S.C. § 51.  Whether the particular evidence presented by Plaintiff constitutes negligence under the FELA is a federal question, governed by federal decisional law.  Urie v. Thompson, 337 U.S. 163, 69 S.Ct. 1018, 93 L. Ed. 1282 (1949).  Without a showing of negligence, there can be no liability since the FELA applies only to injuries caused by negligence and does not make the employer an insurer of the employee.  Wilkerson v. McCarthy, 336 U.S. 53, 69 S. Ct. 413, 93 L. Ed. 497, req. denied, 336 U.S. 940, 69 S.Ct. 744, 93 L. Ed. 1098 (1949); Terminal R. Ass'n of St. Louis v. Howell, 165 F.2d 135 (8th Cir. 1948).  Under normal rules of statutory construction, the duty of care owed an FELA Plaintiff "retains the usual and familiar definition of ordinary prudence."  Gautreaux v. Scurlock Manne, Inc., 107 F.3d 331, 335 (5th Cir. 1997) (discussing FELA legislation).  "[N]othing in the test or structure of the FELA . . .

legislation suggests that the standard of care to be attributed to either an employer or an employee is anything different than ordinary prudence under the circumstances." Id. at 338.

Under the FELA, the violation of a safety statute will foreclose the defendant railroad from raising the defense of the plaintiff's contributory negligence.  The FELA provides, in pertinent part:

> In all actions . . . brought against any such common carrier by railroad . . . , the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee:  Provided, That no such employee who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any **statute enacted for the safety of employees** contributed to the injury or death of such employee.

45 U.S.C. § 53 (emphasis added).  The phrase "any statute enacted for the safety of employees" was only intended to abolish the defenses of contributory negligence and assumption of risk in a case where the railroad's violation of a statute enacted for the safety of railroad employees contributed to the injury or death of an employee.  See Seaboard Air Line Ry. v. Horton, 233 U.S. 492, 503 (1914).  The interaction of a statutory violation and the defense of contributory negligence is discussed as "negligence per se" in the majority of FELA case law.

In the early history of the FELA, courts applied the negligence per se doctrine in cases where railroads had violated the major railroad safety statutes, the Safety Appliance Act, 45 U.S.C. §§ 1-16, and the Boiler Inspection Act, 45 U.S.C. §§ 22-23 & 28-34 (later renamed the Locomotive Inspection Act and recodifed at 49 U.S.C. § 20701 et seq.).  See Practico v. Portland Terminal Co., 783 F.2d 255 (1st Cir. 1985).  At common law, liability for a violation of a statutory duty was only imposed where the injury caused was the one the statute was designed to prevent.  The U.S. Supreme Court, however, in Kernan v. American Dredging Co., 355 U.S. 426 (1958), refused to apply this limiting element of the common law negligence per se doctrine in a

Jones Act case and, because the Jones Act incorporates the FELA's statutory scheme of liability, effectively widened the scope of recovery for FELA plaintiffs alleging statutory violations, holding that a statutory violation under the FELA created liability if the violation contributed "in fact to the death or injury in suit, without regard to whether the injury flowing from the breach was the injury the statute sought to protect. Kernan, 355 U.S. at 433.

As early as 1914, the Supreme Court has recognized that the phrase "statute enacted for the safety of employees" refers only to federal statutes (such as the Safety Appliance Act) and specifically excludes all state laws and regulations. Seaboard Air Line Ry. v. Horton, 233 U.S. 492, 503 (1914). Since then, other state and federal courts have yielded to this principle. See, e.g., Chicago Great W. Ry. Co. v. Peeler, 140 F.2d 865, 869 (8th Cir. 1944); Columbia & P.S.R. Co. v. Sauter, 223 F. 604, 610 (9th Cir. 1915); Smithson v. Atchison, Topeka & Santa Fe Ry. Co., 162 P. 111, 113 (Cal. 1916); Lauer v. Northern Pac. Ry. Co., 145 P. 606, 607-608 (Wash. 1915); Gee v. Lehigh Valley R.R. Co., 163 A.D. 274, 275 (N.Y. App. Div. 1914). Following Horton's holding, one state supreme court reversed its own prior precedent. See Lauer, 145 P. at 607-608. The reasoning for excluding state laws from the definition of "any statute" rests on the fact that

> in enacting a general law for establishing and enforcing the responsibility of common carriers by railroad to their employees in interstate commerce, **Congress [did not] intend to permit the legislatures of the several States to determine the effects of contributory negligence . . . , by enacting statutes for the safety of employees**, since this would in effect relegate to state control two of the essential factors that determine the responsibility of the employer.

Horton, 233 U.S. at 503 (emphasis added). None of the above-cited cases has been reversed.

## 2. State Rail Safety Participation Program

In 1970, Congress amended section 208(d) of the FRSA and provided that "any statute" under 45 U.S.C. § 53 includes "rules, regulations, standards, and requirements in force, or prescribed or issued . . . by any State agency which is participating in investigative and surveillance activities pursuant to" 49 U.S.C. § 20105.  See 45 U.S.C. § 54a.  The current language of the FRSA states: "a regulation, standard, or requirement in force, or prescribed by . . . a State agency that is participating in investigative and surveillance activities under section 20105 of Title 49 is deemed to be a statute under sections 53 and 54 of this title."  45 U.S.C. § 54a.  For purposes of FELA liability, the violation of a statute only gives rise to negligence per se if the statute is considered a federal railroad safety statute under 45 U.S.C. §§ 53 and 54.  State laws are part of this statutory scheme only if the regulation at issue is promulgated by a State that is participating in those activities specifically set forth in 49 U.S.C. § 20105.  "Section 54a of Title 45 and section 20105(a) of Title 49, when they are read together, make clear that state regulations, requirements, etc., are deemed federal safety regulations only when they make the state a participant in the enforcement of such regulations."  Fletcher v. Chicago Rail Link, L.L.C., 568 F.3d 638, 639 (7th Cir. 2009).

49 U.S.C. § 20105 provides that the Secretary of Transportation "may prescribe investigative and surveillance activities necessary to enforce the safety regulations prescribed and orders issued by the Secretary that apply to railroad equipment, facilities, rolling stock, and operations in a State."  49 U.S.C. § 20105(a).  A State "may participate in those activities when the safety practices . . . in the State are regulated by a State authority . . . ."  Id.  The Federal Railroad Administration describes the "State Rail Safety Participation Program" on its website (www.fra.dot.gov) and maintains a list of participating States and State Rail Safety Program

Directors.  **Massachusetts is not a participant**.  (See Rail Safety Participation Program

Documents, attached as Exhibit D.)

In 2009, the Seventh Circuit Court of Appeals analyzed the interaction between the

FRSA, the Rail Safety Participation Program, and FELA liability for statutory/regulatory

violations without a reduction for the plaintiff's contributory negligence.  See Fletcher v.

Chicago Rail Link, L.L.C., 568 F.3d 638 (7th Cir. 2009) (attached as Exhibit E).  In Fletcher, the

defendant railroad appealed a jury verdict in the plaintiff's favor after the trial judge awarded the

plaintiff his full damages because the railroad had violated a regulation of the Illinois Commerce

Commission (the jury also found that the plaintiff was 50% at fault, which would have reduced

his damages by half under the FELA's general comparative negligence scheme).  Writing for the

court, Judge Posner first distinguished between regulations, state statutes, and federal statutes

triggering FELA liability: "A regulation is not a statute, and a state statute is not a federal statute,

and the Supreme Court has held that 'any statute' in 45 U.S.C. § 53 means any federal statute

designed to promote railroad safety."  Fletcher v. Chicago Rail Link, L.L.C., 568 F.3d 638, 639

(7th Cir. 2009), citing Seaboard Air Line Ry. v. Horton, 233 U.S. 492, 503, 34 S. Ct. 635, 58 L.

Ed. 1062 (1914).  Parsing statutory language and assessing Congressional intent with respect to

uniformity of FELA liability, the court determined that, under the FRSA, a state regulation will

only be considered a federal safety statute giving rise to FELA liability under 45 U.S.C. §§ 53

and 54 if the regulation is passed by a State agency participating in the FRA's State Rail Safety

Participation Program pursuant to 49 U.S.C. § 20105.  Fletcher at 639; 45 U.S.C. § 54a.

Specifically, "Section 54a of Title 45 and section 20105(a) of Title 49, when they are read

together, make clear that **state regulations, requirements, etc., are deemed federal safety**

**regulations only when they make the state a participant in the enforcement of such regulations**." Id. (emphasis added).

The court recognized this as a limitation on FELA liability where the plaintiff alleges a state statutory or regulatory violation: "Section 54a requires treating state regulations that support or implement federal safety norms as if they were federal regulations, but there is no basis for thinking that the statute goes further than that." Id. at 640.  The trial judge failed to recognize this limitation when he concluded that, since the Illinois regulation was in effect when 45 U.S.C. § 54a was enacted, the Illinois regulation did not have to relate to any federal regulation.  The court concluded this was error and was an incorrect interpretation of the statutes and Congressional intent: "But on that view [i.e., the trial court's view], Congress gave the force of federal law to all state railroad safety regulations in existence then even if they did not further federal goals, and this is neither a plausible interpretation nor one compelled by the language of the statute or its legislative history." Id. at 639-40.

After its review of the law, the court, using information available on the FRA's website, determined that Illinois was a participant in the Rail Safety Participation Program.  However, the court determined that a violation of the Illinois regulation should not abolish the contributory negligence defense in the underlying case because the Illinois regulation was unrelated to safety concerns of the federal law.  Id.  In other words, the Illinois regulation was not a statute enacted for the safety of railroad employees.

### 3. The Track Statute may not serve as the basis for FELA negligence per se liability.

Judge Posner's analysis in Fletcher is instructive in determining whether M.G.L. ch. 160, § 134A ("Track Statute") is a federal safety statute pursuant to 45 U.S.C. §§ 53 and 54, 45 U.S.C. 54a, and Horton.  As FELA case law makes clear, state statutes and regulations are

generally not considered railroad safety statutes giving rise to FELA negligence per se liability and the barring of the plaintiff's contributory negligence as a defense. Seaboard Air Line Ry. v. Horton, 233 U.S. 492, 503 (1914). Under 45 U.S.C. § 54a, state regulations prescribed by a state agency participating in the 49 U.S.C. § 20105 State Rail Safety Participation Program may be considered federal railroad safety statutes under 45 U.S.C. §§ 53 and 54. Following the plain language of the FRSA and controlling case law, if Massachusetts is not a participant in the 49 U.S.C. § 20105 State Rail Safety Participation Program, the Track Statute should not be considered a federal railroad safety statute under the FELA. A review of information on the FRA's website indicates that Massachusetts is not a participant in the program. (See Ex. D.) Pursuant to the plain language of all involved statutes and the necessary analysis explained by Judge Posner in Fletcher, the Track Statute cannot be deemed a federal railroad safety statute. Therefore, a violation of the Track Statute by P&W in this case cannot give rise to negligence per se under the FELA or abolish the defense of Plaintiff's contributory negligence.

In addition, further analysis indicates that a violation of the Track Statute cannot sustain FELA negligence per se liability. The language of 45 U.S.C. § 54a and the Fletcher analysis make clear that only a State "regulation" passed by a state agency pursuant to participation in the program can give rise to such liability. The Track Statute is a statute passed by the Massachusetts legislature, not a regulation passed by a state agency with responsibility under 49 U.S.C. § 20105. As Fletcher makes clear, there is a difference between regulations, state statutes, and federal statutes. Black's Law Dictionary defines "regulations" as being "issued by various governmental departments to carry out the intent of the law. . . . Regulations are not the work of the legislature and do not have the effect of law in theory." Black's Law Dictionary 1286 (6th ed. 1990). On the other hand, a "statute" is defined as "[a] formal written enactment

of a legislative body . . . ."  Id. at 1410.  In this case, M.G.L. ch. 160, § 134A is a statute, the act

of a legislative body, and not a regulation, the act of an executive or other administrative agency.

Only the latter may be treated as a federal railroad safety statute under 45 U.S.C. 54a and the

FELA, and as the Track Statute is not such a regulation, a violation of the Track Statute cannot

serve as the basis for negligence per se or abolish P&W's contributory negligence defense in this

case.

### C.      Preemption of OSHA Regulations

#### 1.      FRA and OSHA Interaction

As noted, Congress enacted the FRSA for the purpose of promoting "safety in every area

of railroad operations and [to] reduce railroad-related accidents and incidents."  49 U.S.C. §

20101.  The Secretary of Transportation, through the FRA, is vested with the task of carrying out

this purpose.  49 U.S.C. § 20103(a).  In 1970, Congress enacted the Occupational Safety and

Health Act, 29 U.S.C. § 651, et seq., to assure safe and healthful working conditions for every

working person and vested the Secretary of Labor with authority to promulgate and enforce

federal occupational safety and health standards.  29 U.S.C. § 651.  OSHA contains a negative

preemption provision limiting its application.  28 U.S.C. § 653(b)(1).

On March 14, 1978, the FRA issued a policy statement outlining its relationship with

OSHA in the field of railroad worker safety ("1978 Policy Statement," attached as Exhibit F).

Instead of promulgating an extensive set of regulations similar to those promulgated by the

Secretary of Labor pursuant to OSHA, the FRA decided to concentrate on the regulation of

working conditions affecting the safety of "railroad operations," defined as "conditions and

procedures necessary to achieve the safe movement of equipment over the rails."  Ex. F, 43 Fed.

Reg. 10585.  Those areas in the railroad industry that are directly related to railroad operations

can be divided into three categories: (1) track, roadbed and associated device and structures; (2) equipment; and (3) human factors." Id. Recognizing that OSHA was free to exercise jurisdiction with respect to conditions not related to "railroad operations," the FRA affirmatively stated: "As the primary regulatory agency concerned with railroad safety, the FRA will not hesitate to adopt its own standard to assure a safe environment for railroad operations and to promote regulatory consistency." Id. at 10587. The FRA took the position that "piecemeal regulation of individual hazards in any of the three regulatory fields by any other agency of government would be destructive and contrary to the public interests." Id. at 10586.

While the 1978 Policy Statement indicates that OSHA regulations may apply to railroad workers in some circumstances, the FRA clearly indicated that, within the area of railroad operations, its control is exclusive and it retained the sole authority to determine what, if any regulations, are necessary: "Within the area of railroad operations, it is the FRA that must decide what regulations are necessary and feasible." Id. Furthermore, the FRA specifically addressed walking and working surfaces:

> [T]he OSHA regulations would not apply to . . . walk-ways beside the tracks in yards or along the right-of-way. These are areas which are so much a part of the operating environment that they must be regulated by the agency with primary responsibility for railroad safety. Therefore, FRA will determine the need for and feasibility of general standards to address individual hazards related to such surfaces, keeping in mind the requirement of **proper clearances** and the familiarity of employees with existing industry designs.

Id. at 10587 (emphasis added). The FRA thus reserved for itself the sole authority to promulgate regulations regarding walkways beside tracks in rail yards.

OSHA has determined that the FRA's 1978 Policy Statement has the force and effect of law, thereby rendering inapplicable OSHA regulations intruding on the area of railroad operations under the exclusive control of the FRA. See Miller v. Chicago & N.W. Transp. Co.,

925 F. Supp. 583, 587 (N.D. Ill. 1996), citing Sec. of Labor v. Consolidated Rail Corp., 10 BNA

OSHC 1577 (1982) (OSHA standards were held not to apply to railroad inspection pits).  If the

1978 Policy Statement evidences an intent to regulate working conditions, OSHA regulation and

enforcement is preempted.  Sec. of Labor v. Consolidated Rail Corp., 16 BNA OSHC 1033

(1993).  Congress also recognized that overlapping statutes and regulations would be destructive

to extant and future statutes and regulations and had the potential to undermine public policy.  As

a result, Congress included a provision in OSHA limiting the jurisdictional scope of OSHA to

those areas where other federal agencies have not exercised statutory authority to issue and

enforce regulations:

> Nothing in this Act shall apply to working conditions of employees with respect
> to which other Federal agencies, and State agencies acting under section 274 of
> the Atomic Energy Act of 1954, as amended (42 U.S.C. § 2021), exercise
> statutory authority to prescribe or enforce standards or regulations affecting
> occupational safety or health.

See 29 U.S.C. § 653 (b)(1).  This is known as OSHA's "negative preemption" provision.

> ## 2.      Plaintiff's actions were "railroad operations" and subject to the exclusive jurisdiction of the FRA.

In his Complaint, Plaintiff alleges P&W violated a specific OSHA regulation, 29 C.F.R.

1926.701(b), a construction industry regulation requiring the use of rebar caps on rebar used in

concrete construction work ("Rebar Regulation").  Since the filing of the Complaint, Plaintiff's

theory of the case has changed.  His retained liability expert, Clayton Rose, has opined that the

Rebar Regulation did not apply to the circumstances of Plaintiff's incident.  (See Rose Report,

attached as Exhibit G.)  P&W believes that Plaintiff will no longer argue P&W specifically

violated the Rebar Regulation or argue its application to the facts of this case.  Instead, Plaintiff,

through his expert, now asserts P&W violated OSHA's "General Duty Clause," codified at 29

U.S.C. § 654.  Plaintiff seeks to apply this clause to the track-side walkway where Plaintiff was

injured.  The 1978 Policy Statement makes clear that the FRA has reserved for itself the exclusive authority to regulate railroad operations and the area of walkways beside tracks in rail yards.  In addition, OSHA's negative preemption provision bars the application of OSHA regulations where another federal agency exercises statutory authority to prescribe or enforce standards or regulations affecting occupational safety and health.  29 U.S.C. § 653(b)(1).

Here, Plaintiff was acting as a conductor in P&W's Worcester rail yard and was engaged in switching operations.  His task was to supervise and direct the movement of rolling stock over in the rail yard, operate switches, mount and dismount railroad equipment, couple and uncouple railcars, line airhoses, and engage in a number of other activities required to build a train consist. At the same time, Plaintiff was also the acting yard conductor with sole authority to direct the movement of trains into and out of P&W's rail yard.  (Ex. A at 113, 124-26, 150.)  Just before his incident, he was dismounting a rail car to engage a derail on one of P&W's tracks.[3]  At all times, all of Plaintiff's activities were intimately connected to "railroad operations."  In fact, all of Plaintiff's activities were "railroad operations" (conditions and procedures necessary to achieve the safe movement of equipment over the rails).  All of Plaintiff's activities were within the exclusive jurisdiction the FRA retained for itself via the 1978 Policy Statement.  The FRA was, at all times, the only federal agency with authority to regulate Plaintiff's railroad operations activities.

In addition, the FRA's assertion of its exclusive authority over walkways beside tracks and "proper clearances" in rail yards triggers OSHA's negative preemption provision and precludes enforcement of OSHA regulations in such areas.  The fact that the FRA has not issued a specific track-side walkway regulation is irrelevant; that the Secretary of Transportation,

---

[3] A derail is a piece of equipment that, when attached to the rail of a railroad track, prohibits railcars from freely moving on the track past that point.

through the FRA, "has not seen fit to exercise its authority to the full extent conferred has no bearing upon the construction of the act delegating the power." Napier v. Atlantic Coast Line R.R. Co., 272 U.S. 605, 613 (1926); Oglesby v. Delaware & Hudson Ry. Co., 180 F.3d 4588, 461 (2d Cir. 1999) (the issue "is not whether the federal government has exercised its authority but whether it possesses the power [to do so] in the first place.").

The 1978 Policy Statement is clear: the FRA has evidenced an intent to regulate the area of railroad operations and the specific area of walkways beside tracks in rail yards, including "proper clearances." OSHA's negative preemption provision is triggered by the FRA's assertion of exclusive jurisdiction. OSHA regulations affecting Plaintiff's performance of his duties as a conductor and his use of walkways beside the tracks in P&W's Worcester rail yard are preempted.

**D.     OSHA violations do not constitute negligence per se under the FELA.**

Plaintiff has alleged in his Complaint that P&W violated a specific OSHA regulation and may argue that the violation of an OSHA regulation constitutes negligence per se under the FELA, removing Plaintiff's contributory negligence from the jury's consideration and leaving only the element of causation for determination. While it is true that, generally speaking, the violation of a statute enacted for the safety of railroad employees will give rise to negligence per se under the FELA, the scope of FELA negligence per se liability is not so expansive as to include the violation of OSHA regulations.

**1.     The majority of courts have held that a violation of an OSHA regulation in an FELA case does not constitute negligence per se.**

The overwhelming majority of courts recognize that OSHA violations cannot serve as the basis of negligence per se under the FELA. See, e.g., Jones v. Spentonbush-Red Star Co., 155 F.3d 587, 594-596 (2d Cir. 1998); Robertson v. Burlington N. R.R. Co., 32 F.3d 408 (9th Cir.

1994) (violation of OSHA regulation may serve as some evidence of negligence to be considered only in relation to all other evidence in the case but OSHA violation does not constitute negligence per se in FELA case); Ries v. National R.R. Passenger Corp., 960 F.2d 1156, 1160-1165 (3d Cir. 1992); Merritt v. Bethlehem Steel Corp., 875 F.2d 603, 608 (7th Cir. 1989); Albrecht v. Baltimore & Ohio R.R., 808 F.2d 329 (4th Cir. 1987) (violation of OSHA regulations does not establish negligence per se in FELA actions); Minichello v. U.S. Indus., Inc., 756 F.2d 26, 29 (6th Cir. 1985) (using OSHA regulations to establish that a product is unreasonably dangerous is improper); Bertholf v. Burlington N. R.R., 402 F. Supp. 171, 173 (E.D. Wash. 1975) (violation of OSHA regulations does not bar contributory negligence under the FELA); Hebel v. Conrail, Inc., 475 N.E.2d 652 (Ind. 1985) (violation of OSHA regulation does not constitute negligence per se in FELA action); Canape v. Petersen, 897 P.2d 762, 765-767 (Colo. 1995); Wendland v. Ridgefield Constr. Servs., Inc., 439 A.2d 954, 956-957 (Conn. 1981); Miller v. Pacific Trawlers, Inc., 131 P.3d 821, 835-838 (Or. App. 2006).

The courts listed above begin their analyses with the OSHA statute's express limitation provision:

> Nothing in this chapter shall be construed to supersede or in any manner affect any workmen's compensation law or **to enlarge or diminish or affect in any other manner the common law or statutory rights, duties, or liabilities of employers and employees** under any law with respect to injuries, diseases, or death of employees arising out of, or in the course, of employment.

29 U.S.C. § 653(b)(4) (emphasis added).  Based on the plain language the OSHA statute, particularly focusing on the intention that the statute not "enlarge or diminish or affect . . . the common law or statutory rights, duties, or liabilities of employers," the majority of courts have concluded that allowing the violation of an OSHA regulation to constitute negligence per se would enlarge employer liability under the FELA.  See Reis v. Nat'l R.R. Passenger Corp., 960

at 1162.  If OSHA regulations were allowed to serve as the basis for negligence per se in FELA cases and bar contributory negligence as a defense, the statutory duty of the railroad employer would be effectively enlarged.  See id.; Albrecht v. Baltimore & Ohio R.R., 808 F.2d at 333.

In addition to the limiting language of 29 U.S.C. § 653(b)(4), OSHA regulations should not be considered safety statutes under the FELA.  The Third Circuit Court of Appeals explained in Reis:

> Railroad safety statutes such as the Safety Appliance and Boiler Inspection Acts do not occupy the same position *vis-a-vis* the FELA as does OSHA. Indeed, the Supreme Court has held that these two railroad safety statutes "are substantively if not in form *amendments* to the Federal Employers' Liability Act."  The same cannot be said about OSHA.

Reis at 1164, citing Urie v. Thompson, 337 U.S. 163 at 189 (1949) (emphasis in original).  The Reis court emphasized that FELA negligence per se liability is predicated on the violation of railroad safety statutes: "[T]he Supreme Court has never extended the statutory duty of care of a railroad employer beyond [those] statutes specific to the railroad industry, and we are reluctant to imply such an extension in the absence of express guidance from the Court."  Id. at 1163. Noting that OSHA does not create a private right of action and that Congress established an "elaborate system of administrative civil and criminal penalties for violations for punishing OSHA violations," the Reis court concluded:

> For this court to allow an OSHA violation to serve as the basis for a negligence per se suit under the FELA would create an implied private cause of action, and thus upset the Congressional scheme for enforcing workplace safety through administrative penalties. We cannot say that the legislatively created sanctions for OSHA violations are insufficient and require judicial supplementation nor can we say that any "useful purpose related to Congressional policy goals would be served by tacking on yet another enforcement vehicle."

Id. at1164 (internal citations omitted).

The ultimate holding of the Third Circuit Court of Appeals in <u>Reis</u>, along with many other circuit courts, is that the violation of an OSHA regulation may not serve as the foundation for a negligence per se suit under the FELA: "[A]llowing the OSHA violation to constitute negligence per se and bar contributory negligence in a FELA suit would be contrary to both the FELA and OSHA." <u>Id.</u>  While the violation of an OSHA regulation may serve as some evidence of negligence, to be considered in relation to all other evidence in the case, the violation of an OSHA regulation is not negligence per se.   <u>See Reis</u> at 1165; <u>Albrecht</u>, 808 F.2d at 332; <u>Robertson v. Burlington N. R.R. Co.</u>, 32 F.3d 408, 410 (9th Cir. 1994).

## 2.       <u>Practico v. Portland Terminal Co.</u> is no longer good law.

Plaintiff's anticipated reliance on <u>Practico v. Portland Terminal Co.</u>, 783 F.2d 255 (1st Cir. 1985), is misguided.  The <u>Practico</u> court held that the OSHA negative preemption provision of 29 U.S.C. § 653(b)(4) "does not prevent violations of OSHA regulations from being considered as evidence of negligence per se." <u>Practico</u> at 266-267.  Finding support in Fifth Circuit Court of Appeals precedent, the court reasoned that the "legislative history of § 653(b)(4) shows that the intent of the provision was merely to ensure that OSHA was not read to create a private right of action for injured workers which would allow them to bypass the otherwise exclusive remedy of worker's compensation." <u>Id.</u> at 266.  Without any detailed explanation, the court added:  "[W]e do not find that the plain language of [§ 653(b)(4)] is violated by allowing the regulations to serve as standards of care under the doctrine of negligence per se; the rights, liabilities and duties of the railroad are established by FELA and not by OSHA." <u>Id.</u>

Since that decision, however, the "First Circuit has characterized <u>Practico</u> as being "of questionable validity." <u>Elliott v. S.D. Warren Co.</u>, 134 F.3d 1, 4 (1st Cir. 1998).  Although the First Circuit Court of Appeals has not yet overruled <u>Practico</u>, in <u>Elliot</u> it seemed to indicate that it

may do so when faced with that issue again by recognizing that the majority of circuits "have held squarely that, because the OSH[A] does not create a private right of action, a violation of an OSHA regulation never can be equated with negligence per se." Id.  The First Circuit Court of Appeals explained its mistake by stating:  "At the time this court decided Practico, we had very little guidance from our sister circuits." Id.

In addition, Federal District Courts in the First Circuit have taken the Elliot language to heart.  In Falconer v. Penn Maritime, Inc., the U.S. Federal District Court for the District of Maine considered the relationship of OSHA violations and negligence per se and validity of the Practico holding in the context of a Jones Act case.[4]  The Falconer court was persuaded by the majority other Circuits and First Circuit Court of Appeals' suggestions in Elliot:

> The doctrine of *stare decisis* "renders the ruling of law in a case binding in future cases before the same court or other courts owing obedience to the decision", Gately v. Massachusetts, 2 F.3d 1221, 1226 (1st Cir. 1993), and Pratico remains the last time the First Circuit has ruled directly on the issue. Nevertheless, the First Circuit has said that "there may be occasions when courts can -- and should -- loosen the iron grip of stare decisis." United States v. Reveron Martinez, 836 F.2d 684, 687 n.2 (1st Cir. 1988).  Any such departure demands "special justification." Arizona v. Rumsey, 467 U.S. 203, 212, 81 L. Ed. 2d 164, 104 S. Ct. 2305 (1984).  **This Court concludes that "special justification" exists here. The First Circuit itself has called Pratico "of questionable validity" and has suggested strongly that if presented with the same issue, it would join the growing majority of circuits and conclude that an OSHA violation does not constitute negligence per se.**  As a practical matter, if this Court does not take the First Circuit's hint in Elliot, this case may well have to be retried. If Mr. Falconer presents evidence of a causative OSHA violation, the jury will be virtually compelled to conclude Penn Maritime was negligent. If Penn Maritime appeals and, as appears virtually inevitable, the First Circuit adopts the majority rule, it is likely the entire matter will be remanded to weigh the non-conclusive impact of the OSHA violation.  In this narrow circumstance, for reasons of judicial economy and in view of Elliot, this Court will apply the law Elliot presaged in 1998, not the law Pratico held in 1985.

---

[4] The Jones Act is a federal statute granting maritime workers the right to bring negligence actions against their employers for work-related injuries.  It is based on the FELA scheme and is interpreted through FELA case law. See Kelly v. Keystone Shipping Co., 281 F. Supp. 2d 313 (D. Mass. 2003).

<u>Falconer</u> at 73 (emphasis added).  The court then determined that the violation of an OSHA regulation would also not serve to bar the defendant's contributory negligence defense.  <u>Id.</u> at 74-5.

According the majority of federal courts, the violation of an OSHA regulation does not constitute negligence per se under the FELA, nor does such a violation bar the defense of contributory negligence.  Given the language of <u>Elliot</u> and the <u>Falconer</u> analysis, the First Circuit Court of Appeals is likely in agreement and will soon overturn the "questionable" <u>Practico</u> holding.  In the instant case, the violation of any OSHA regulations should not trigger FELA negligence per se liability and should not prohibit P&W from arguing Plaintiff's contributory negligence.

## III.    <u>CONCLUSION</u>

WHEREFORE, Defendant Providence and Worcester Railroad Company respectfully moves this Honorable Court to find the application of the Massachusetts track clearance statute, M.G.L. ch. 160, § 134A is preempted by the ICCTA and that Occupational Safety and Health Act regulations are preempted by the FRA's reservation of exclusive jurisdiction over railroad operations in its 1978 Policy Statement.  In the alternative, P&W moves the Court to find that a violation of M.G.L. ch. 160, § 134A and the violation of an OSHA regulation does not constitute negligence per se under the FELA and that a violation of either M.G.L. ch. 160, § 134A or any OSHA regulation will not bar P&W's contributory negligence defense under the FELA.

Respectfully submitted,
PROVIDENCE AND WORCESTER RAILROAD
COMPANY,
by its attorneys,


/s/ Seth C. Turner_____
Seth C. Turner          BBO # 673329
sturner@flynnwirkus.com
FLYNN & WIRKUS, P.C.
400 Crown Colony Drive/Suite 200
P.O. Box 699242
Quincy, MA  02269
Tel: (617) 773-5500

Dated: October 22, 2010                Fax: (617) 773-5510

## <u>CERTIFICATE OF SERVICE</u>

I, Seth C. Turner, counsel for the Defendant Providence and Worcester Railroad Company, hereby certify that a true and accurate copy of the *Brief of Defendant Providence and Worcester Railroad Company Regarding Preemption and FELA Negligence Per Se* was served by CM/ECF electronic filing on the following:

Robert T. Naumes
Thorton & Naumes LLP
100 Summer Street, 30th Floor
Boston, MA 02110

October 22, 2010                                    /s/ Seth C. Turner_____
                                                    Seth C. Turner